# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Faith Genser and Frank Matis, | : | **CASES CONSOLIDATED** |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| Butler County Board of Elections, | : | |
| Republican National Committee, | : | Trial Ct. No. MSD-2024-40116 |
| Republican Party of Pennsylvania, and | : | |
| The Pennsylvania Democratic Party | : | No.     1074 C.D. 2024 |
| | : | |
| Faith Genser and Frank Matis, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Butler County Board of Elections, | : | |
| Republican National Committee, | : | |
| Republican Party of Pennsylvania, and | : | |
| The Pennsylvania Democratic Party | : | |
| | : | |
| Appeal of: The Pennsylvania | : | No.     1085 C.D. 2024 |
| Democratic Party | : | Submitted: August 28, 2024 |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE MATTHEW S. WOLF, Judge

## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                              FILED:  September 5, 2024

The Pennsylvania Election Code allows mail-in and absentee voters to vote provisionally under some circumstances.  In this case, two Pennsylvania voters—Faith Genser and Frank Matis (Electors)—tried to vote by mail in the 2024

Primary Election. Their mail-in ballots were fatally defective and were not counted. Electors also went to their polling places on Primary Election Day, April 23, 2024, and submitted provisional ballots. Those ballots also were not counted. Thus, neither Elector has had any vote counted in the 2024 Primary Election.

The question in this appeal is whether the Election Code prohibits counting Electors' provisional ballots because their fatally flawed mail-in ballots were timely received by Election Day. Importantly, that is a question about provisional voting and counting provisional ballots, which is distinct from the question whether an elector can cure a defect in a mail-in ballot. The Court of Common Pleas of Butler County (Trial Court) held, in an August 16, 2024 decision, that the provisional ballots cannot be counted pursuant to the Pennsylvania Election Code (Election Code or Code),[1] in part because that would amount to ballot curing. We reject that view. We hold that the Election Code, properly construed, does not prohibit counting Electors' provisional ballots. Accordingly, we reverse the Trial Court's order and direct the Butler County Board of Elections (Board) to count them.

## I. BACKGROUND

The facts are not in dispute. Electors are registered voters residing in Butler County, Pennsylvania (County). They sought to vote in the 2024 Primary Election by mail-in vote. Both Electors received their mail-in ballot materials from the Board, marked their mail-in ballots with their candidates of choice, deposited the ballots directly into the declaration envelopes, and mailed the declaration envelopes to the Board. The Board received Electors' declaration envelopes well in advance

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591. To promote clarity, and because the Trial Court and the parties in this case refer to the various provisions of the Election Code by their unofficial Purdon's citations, so do we.

of the Election Code's statutory deadline,[2] and upon receipt placed them into a machine called the Agilis Falcon.  The Agilis Falcon detected that Electors failed to place their mail-in ballots in secrecy envelopes before depositing them in the declaration envelopes, as required by 25 P.S. § 3150.16(a).[3]  As a result, the Board updated the status of Electors' mail-in ballots in the Statewide Uniform Registry of Electors (SURE) System, and they received an automatic email notice advising as follows:

> After your ballot was received by BUTLER County, it received a new status.
>
> **Your ballot will not be counted because it was not returned in a secrecy envelope**.  If you do not have time to request a new ballot before April 16, 2024, or if the deadline has passed, **you can go to your polling place on election day and cast a provisional ballot**.

Petition for Review in the Nature of a Statutory Appeal, Ex. 1 (Declaration of Faith Genser, Ex. B); Ex. 2 (Declaration of Frank Matis ¶ 9) (emphasis added).

Electors appeared at their respective polling places on April 23, 2024—the day of the 2024 Primary Election—and cast provisional ballots.  They were subsequently informed that their provisional ballots were rejected.

Electors filed a Petition for Review in the Nature of a Statutory Appeal (Petition) with the Trial Court.  Therein, Electors argued they were disenfranchised when the "Board rejected [Electors'] mail-in ballots due to lack of an inner secrecy envelope, but then refused to count the provisional ballots [Electors] cast on Election

---

[2] The Code requires that mail-in ballots must be received "on or before eight o'clock P.M. the day of the primary or election."  25 P.S. § 3150.16(a).

[3] Absentee ballots are also required to be placed in a secrecy envelope.  *See* 25 P.S. § 3146.6(a), added by Section 11 of the Act of March 6, 1951, P.L. 3.  Absentee and mail-in ballots that are returned without a secrecy envelope are often referred to as "naked ballots."

3

Day." Pet. ¶ 2.[4]   Specifically, they argued that the Board's decision to reject their provisional ballots violates the Election Code, is based on a misinterpretation of Pennsylvania Supreme Court precedent,[5] and violates Electors' right to vote guaranteed by the free and equal elections clause of the Pennsylvania Constitution, PA. CONST. art. I, § 5.   The Trial Court granted intervention to the Republican National Committee and the Republican Party of Pennsylvania (collectively, Republican Party, and with the Board, Appellees) and the Pennsylvania Democratic Party (Democratic Party, and with Electors, Appellants).   On May 7, 2024, the Trial Court held a hearing on Electors' Petition.

Chantell McCurdy, Director of Elections for the Board (Director McCurdy), and Electors testified.   Director McCurdy testified at length about the tracking of mail-in votes through the SURE System, the Board's procedures in canvassing mail-in and provisional ballots, and the Board's notice and cure policy.

In regard to electors who wish to vote by mail, Director McCurdy explained that the SURE System begins tracking a mail-in ballot at the moment a qualified elector requests one.   Hearing Transcript, May 7, 2024 (Hr'g Tr.) at 39. Once the mail-in ballot materials have been sent to the elector, the status in the SURE System is changed to "ballot sent." *Id.*   Those materials include (1) the ballot for that elector's precinct, (2) a secrecy envelope, (3) the declaration envelope, and (4) instructions. *Id.* at 38.   Each declaration envelope has a label affixed to it containing a barcode that identifies the voter by his or her voter identification number. *Id.* at

---

[4] Notably, Electors do not challenge the Board's decision to reject their mail-in ballots for lack of a secrecy envelope.   They challenge solely the Board's decision not to count their provisional ballots.

[5] Specifically, Electors argued the Board misinterpreted *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) (*Boockvar*), to conclude that electors who return naked mail-in ballots are forbidden to cure the error.

4

32-33. Pending the Board's receipt of a returned declaration envelope, the SURE System status indicates the ballot is "pending not yet returned." *Id.* at 33.

Director McCurdy testified that the Department of State communicates internally with county boards of elections to advise how to record mail-in ballots into the SURE System once those ballots are received. Hr'g Tr. at 45. She explained that

> [w]hen we receive a ballot back in the office, we are to as quickly as possible in order to timely release the information to the Department of State record those ballots in. What I mean by record is I had mentioned earlier on the declaration envelope there is a label. That label contains a barcode that is uniquely identifiable to an individual voter and their assigned voter ID number once they are registered as a registered voter in Butler County. We scan those in, and the way we scan them in determines how it's relayed to the Department of State. So the standard response for a ballot before it's returned is pending not yet returned. When we record it in as received, it is, record ballot returned.

*Id.* at 32-33. However, not all declaration envelopes received by the County are entered into the SURE System as "record ballot returned." Director McCurdy explained that other statuses may be entered manually into the SURE System if a defect on the declaration envelope is detected:

> [County's Counsel]: Now, how does—how does that happen? What is sort of the magic of how that information is collated? We discussed earlier that these ballots haven't been opened. []
>
> [Director McCurdy]: Correct.
>
> [County's Counsel]: How is any of the information disseminated?
>
> [Director McCurdy]: So I guess first it relates to how the

5

ballots are recorded in.

[County's Counsel]: Okay.

[Director McCurdy]: In which case the Butler County Office has a machine called—it's an Agilis Falcon, and all of the ballots that come in through the mail are placed in this machine. It sorts them. It also evaluates the dimensions of the envelope, specifically the length, height, to make sure that this is in fact an official election envelope with the required materials inside. As long as it does, it goes through, sorts by precinct. That information is exported onto a USB that I then import myself on my computer into the SURE [S]ystem as record ballot returned.

If there are any ballots that it finds any sort of an issue with in that process, meaning it isn't thick enough, it's too thick, one of those two, or we've gotten envelopes for other counties; theirs are slightly longer or taller, it also ends up in the first bin. That bin then has to be evaluated by our office to record in individually.

When we record them in individually, we record them in to the best of our ability as to what we think is possibly wrong with the issue. If it's another county's ballot, we do our best to get that ballot to the county. If it is our ballot, we record it in given the best possible response from the Department of State options. When we scan in the barcode, there is a list of options that it gives us that we're able to chose from, and we chose the most likely based on the scenario.

[County's Counsel]: But you're guessing? Is that a fair—

[Director McCurdy]: Yes.

[County's Counsel]: —way to summarize what you're doing is you're guessing what's wrong with it?

[Director McCurdy]: Correct.

[County's Counsel]: And, you know, you could open up

6

the envelope on the day of the canvass and realize that somebody has put something that has nothing to do with the election in the envelope?

[Director McCurdy]: Yes. And that did happen.

[County's Counsel]: And can you explain to the Court, you know, that circumstance, just by way of illustration?

[Director McCurdy]: Yes. So the machine evaluated an envelope as correct. It recorded it in as ballot returned. On Election Day, during the—in the morning when we're starting to open our envelopes, we have envelope openers that do it. They open the outside envelope, separate the inner secrecy envelope, all to preserve voter secrecy. That's very paramount for us.

Then they open the internal envelopes. The internal secrecy envelopes for this individual, the one envelope we opened, and it contained a copy of medical records for a person. But the way that it was folded in such, it matched the width dimensions of what the machine thought would be a ballot.

[County's Counsel]: So you can't know then with any degree of certainty whether or not somebody has included the secrecy envelope or included their medical records or their kid's report card until your Computation Board has assembled to open those envelopes? Is that a fair summary?

[Director McCurdy]: That's correct. . . .

Hr'g Tr. 33-35. Because the Election Code forbids mail-in ballots to be opened before seven o'clock A.M. on Election Day,[6] unless the defect is obvious from the face of the declaration envelope, the status listed in the SURE System is nothing more than a guess. *Id.*

---

[6] 25 P.S. § 3146.8(a), (g)(1.1).

For defects that are readily detectable on the face of a declaration envelope, Director McCurdy testified that the County has instituted a notice and cure policy (Curing Policy or Policy).[7] She explained that the Curing Policy permits electors to cure deficiencies on the declaration envelope by signing an attestation at the Board's office, "or by voting via provisional ballot acting as the attestation at the polling place." Hr'g Tr. at 50. Therefore, if an elector, for example, fails to sign the declaration envelope, he or she has two ways to fix that problem and have the vote count. *Id.* at 60-61. Director McCurdy testified that while defects to the declaration envelope are curable pursuant to the Policy, the County did not adopt any curing procedures for naked ballots. When questioned about the automated email advising Electors that they could vote by provisional ballot because their mail-in votes would not count, Director McCurdy agreed that the SURE System's automated email provided Electors with false directions:

> [County's Counsel]: Okay. So Butler County was not offering [Electors] the opportunity to come in and cast a provisional ballot in the event they didn't have—their secrecy envelope was missing. But, as I understand what you're saying now, the [Department] of State website automatically advised these folks that they could vote by provisional ballot?
>
> [Director McCurdy]: That's correct.

*Id.* at 48-49. Director McCurdy was also questioned about how the Board would treat a timely received declaration envelope that contained a secrecy envelope but omitted the actual mail-in ballot. *Id.* at 63-64.

> [Electors' Counsel]: Okay. I want to ask some questions also about—going back to mail-in balloting, when you opened the envelopes on the Friday after the election for

---

[7] The Curing Policy can be found in the Original Record, Item No. 25, Ex. 1.

mail-in ballots, what would happen if you received one that had a secrecy envelope inside, but not the actual ballot inside?

[Director McCurdy]: I'm not sure I understand. So during the Computation Board?

[Electors' Counsel]: Correct. Computation Board, they open the envelopes they find—they open the outer envelope; inside there's a secrecy envelope. They open the secrecy envelope; it's empty.

[Director McCurdy]: Okay.

[Electors' Counsel]: What would happen in that situation? Would there be a mail-in vote—there would not be a mail-in vote counted for that voter? Right?

[Director McCurdy]: Correct, because there is no eligible ballot.

[Electors' Counsel]: Right. What if that voter had also completed a provisional ballot at the polling place on Election Day? Would the Computation Board count that provisional ballot?

[Director McCurdy]: No.

[Electors' Counsel]: And why not?

[Director McCurdy]: Because they've already turned in a ballot.

[Electors' Counsel]: What ballot did they already turn in?

[Director McCurdy]: The one that was marked in the SURE [S]ystem, record ballot returned.

[Electors' Counsel]: Okay. So, in other words, even if the voter didn't send in a ballot because they sent in the outer envelope and the secrecy envelope, [the County] still marks that as a ballot returned in the SURE [S]ystem?

9

[Director McCurdy]: Yes.

*Id.*

Finally, Director McCurdy testified about electors who intend to vote by mail but are concerned that their ballots may not be timely received and therefore also appear on Election Day and complete a provisional ballot. Hr'g Tr. at 64. She explained that where the Board has an elector's provisional ballot and also receives that elector's mail-in ballot past the statutory deadline, it will count the elector's provisional ballot. *Id.* at 64-65. The elector's tardy mail-in ballot is deemed ineligible because it was received after the statutory deadline. *Id.* at 65.

Electors also testified. Mr. Matis testified that after he received the email from the Department of State that his mail-in vote would not be counted, he called the Bureau of Elections and was advised that he "had to do a provisional ballot" and "could not come in and fix [his] ballot." Hr'g Tr. at 88. Ms. Genser also testified that she called the Bureau of Elections after receiving the email from the Department of State that her mail-in vote would not be counted. *Id.* at 144-45. Ms. Genser explained that she was upset by the response to her questions about her mail-in ballot, and ultimately believed that her provisional ballot would not count. *Id.* at 146, 150; Pet., Ex. 1 ¶¶ 15-17. She chose to cast a provisional ballot anyway. *Id.* at 169.

On August 16, 2024, the Trial Court issued a memorandum opinion and order (Trial Court Opinion) dismissing Electors' Petition and affirming the Board's decision not to count Electors' provisional ballots. The Trial Court found the Board did not commit an error of law or abuse its discretion when it rejected Electors' provisional ballots, as its actions were in accord with 25 P.S. § 3050(a.4)(5)(i) and (ii)(F), which it read to foreclose the counting of provisional ballots cast by electors who had timely submitted mail-in ballots, even if those electors' timely submitted

10

mail-in ballots were previously rejected. The Trial Court also found Electors' constitutional challenges without merit. Appellants appealed the Trial Court's order to this Court.[8, 9]

## II. STATUTORY FRAMEWORK

As it is critical to our analysis, we first discuss the relevant provisions of the Election Code. Voting by qualified mail-in electors is addressed in Article XIII-D of the Election Code, 25 P.S. §§ 3150.11-3150.17.[10]

25 P.S. § 3150.16, titled "Voting by mail-in electors," provides:

> **(a) General rule.**--At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. The elector shall then fill out, date and sign the declaration printed on such envelope. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.
>
> . . . .
>
> **(b) Eligibility.**--

---

[8] By Order dated August 22, 2024, this Court consolidated Appellants' appeals.

[9] This appeal requires this Court to interpret provisions of the Election Code, which, as a question of law, is subject to a de novo standard of review and a plenary scope of review. *Banfield v. Cortes*, 110 A.3d 155, 166 (Pa. 2015).

[10] Aritcle XIII-D of the Code was added by the legislation commonly called Act 77, Act of October 31, 2019, P.L. 552, No. 77 (Act 77).

(1) Any elector who receives and votes a mail-in ballot under [ 25 P.S. § 3150.11] shall not be eligible to vote at a polling place on election day. The district register at each polling place shall clearly identify electors who have received and voted mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who voted a mail-in ballot to vote at the polling place.

(2) An elector who requests a mail-in ballot and who is not shown on the district register as **having voted** may vote by provisional ballot under [25 P.S. § 3050(a.4)(1)].

. . . .

(c) Deadline.-- Except as provided under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot), a completed mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.

25 P.S. § 3150.16 (emphasis added). Pursuant to subsection(b)(2), an elector who requests a mail-in ballot and who is "not shown on the district register as having voted may vote by provisional ballot" under 25 P.S. § 3050(a.4)(1). This subsection will be hereinafter referred to as the "Having Voted Clause."

As cross-referenced in the Having Voted Clause, 25 P.S. § 3050 discusses voting by provisional ballot. Relevant here are subsections (a.4)(5)(i), which we refer to as the "Casting Clause," and (a.4)(5)(ii)(F), which we refer to as the "Timely Received Clause." Together, the Casting Clause and the Timely Received Clause direct when provisional ballots shall and shall not be counted. They provide:

(5)(i) Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the

12

elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not **cast** any other ballot, including an absentee ballot, in the election.

(ii) A provisional ballot shall not be counted if:

. . . .

(F) the elector's absentee ballot or mail-in ballot is **timely received** by a county board of elections.

25 P.S. § 3050(a.4)(5)(i), (ii)(F). The parties' arguments advance competing interpretations of the Having Voted, Casting, and Timely Received Clauses, and at various times, rely on other Election Code provisions to support their arguments. Other Election Code provisions, where necessary, will be discussed and set forth *infra*.

## III.  ARGUMENTS

## A.  Parties' Arguments

*1.  Appellants*

Appellants[11] argue that the plain language of the Election Code, properly construed, requires the Board to count the provisional ballots. To support their proffered construction, they review the history and purpose of provisional voting, which they stress is intended to prevent disenfranchisement. They explain that the 2002 Help America Vote Act (HAVA), in part, required states to implement provisional-voting regimes for federal elections. 52 U.S.C. § 21082 (*formerly* 42 U.S.C. § 15482). The General Assembly added 25 P.S. § 3050(a.4) to the Code to

---

[11] We present Appellants' arguments together because they are substantially aligned. We note differences between their arguments where appropriate. We take the same approach with Appellees' arguments in Part III.A.2, *infra*.

13

fulfill HAVA's mandate. The purpose of provisional voting is to act as a fail-safe to ensure that voters can vote exactly once—not zero times and not twice. Determinations about whether a provisional ballot can be counted are routinely and necessarily made after canvassing has begun, and the Board considers whether the voter has already cast a valid ballot to prevent double voting. Appellants point out that the Election Code specifically authorizes provisional voting by electors who request mail-in or absentee ballots but do not vote those ballots. 25 P.S. §§ 3150.16(b)(2), 3146.6(b)(2).

Appellants focus on two phrases in 25 P.S. § 3050(a.4)(5), which directs the Board to count, or not count, certain provisional ballots that have been cast. They argue these two clauses are ambiguous when read together because they could simultaneously require and prohibit counting of a given provisional ballot. First, the Board must count a provisional ballot if the voter "did not cast any other ballot." *Id.* § 3050(a.4)(5)(i). Second, the Board must *not* count the provisional ballot if "the absentee or mail-in ballot is timely received." *Id.* § 3050(a.4)(5)(ii)(F). In support they cite *Keohane v. Delaware County Board of Elections* (Del. Cnty. Ct. Com. Pl., No. CV-2023-4458, filed Sept. 21, 2023), where the Delaware County Court of Common Pleas held that a provisional ballot must be counted if an earlier mail-in ballot is rejected as defective, even if it was also received—the opposite of the statutory interpretation the Trial Court reached here.

Regarding the Casting Clause, Appellants essentially argue that *cast* is a term of art, implying a formal submission of a ballot that will be processed and counted in order to register the elector's choice. They argue that, as the trial court held in *Keohane*, voters who have *tried to* cast mail-in ballots, but did not successfully do so because those ballots were later cancelled as defective, cannot be

14

said to have *cast* a ballot under the Casting Clause. Thus, they claim the Casting Clause requires the Board to count the provisional ballots because the earlier mail-in ballots were never actually cast. They point to the affidavit voters must sign to vote provisionally under 25 P.S. § 3050(a.4)(2), stating that the provisional ballot is the "only ballot [the voter] cast in this election."

Further, Appellants argue the Timely Received Clause does not prohibit counting the provisional ballots. The "ballot" that triggers that clause once timely received must also be a *valid* ballot—one that is not later cancelled, rejected, or otherwise not given effect. If it is not a valid ballot, it is not "a . . . ballot," so there is no ballot that was "timely received." Thus, timeliness is only one aspect of the Timely Received Clause, and timely receipt comes into play only if there is a valid ballot submitted. Appellants disagree with the construction Appellees propound and the Trial Court adopted: that the Code requires "the Board [to] treat a received *Declaration Envelopes* [sic] as that voter's return of their ballot, *even if that Declaration Envelope is empty*." Trial Court Op. at 21 (emphasis added). This, they argue, conflates "ballot"—the word the statute actually uses—with "envelope." It cannot be, they argue, that timely receipt of *any* declaration envelope purporting to contain a ballot—even a naked ballot, a blank ballot, or no "ballot" at all—can mean that a "*ballot* [was] timely received," as the Timely Received Clause requires. They point out that the empty-envelope hypothetical was precisely Director McCurdy's testimony and that the Trial Court acknowledged the abstract absurdity of that construction. *See* Trial Court Op. at 21.

Appellants ask us to resolve the ambiguity in the clauses to require Electors' provisional ballots to be counted. They argue that under their proposed interpretation, the Casting and Timely Received Clauses can be harmonized—and

15

critically, can be construed consistently with the Code's other provisional voting sections. For the Casting Clause, they propose that *cast* refers to ballots that are or will be counted. It does not include those that have been submitted and which might later be found to contain—or have already been found to contain— fatal defects and not be counted. For the Timely Received Clause, they argue that a *ballot* is not received unless it is a validly cast ballot, regardless of whether the envelope purporting to contain the ballot is physically received by the Board. Appellants argue resolving the ambiguity in this way favors enfranchisement, effectuates the purpose of provisional voting to ensure that each elector can vote exactly once (not zero times), and is more consistent with a commonsense reading of the Code's provisions as a whole.

Appellants argue that caselaw on which Appellees rely is either distinguishable or not persuasive. In *Boockvar*, the Supreme Court held that counties are not required under the Code to allow curing of defective mail-in ballots. 238 A.3d at 374. Electors specifically distinguish *Boockvar* because it addressed only ballot curing, not the distinct issue raised here—whether a board of elections must count a provisional ballot. Second, Appellants would reject our decision in *In re Allegheny County Provisional Ballots in the 2020 General Election* (Pa. Cmwlth., No. 1161 C.D. 2020, filed November 20, 2020) (*Allegheny County*), *appeal denied*, 242 A.3d 307 (Pa. 2020),[12] as nonbinding and unpersuasive. In *Allegheny County*, this Court held that the Timely Received Clause in 25 P.S. § 3050(a.4)(5)(ii)(F) is unambiguous and prohibits counting provisional ballots if an earlier mail-in or absentee ballot is timely received. *Allegheny County*, slip op. at 8. Appellants point

___

[12] Unreported decisions of this Court issued after January 15, 2008, are not binding precedent. Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

16

out, however, that *Allegheny County* did not consider the ambiguity that arises when that clause is read together with, instead of in isolation from, the Casting Clause in 25 P.S. § 3050(a.4)(5)(i), and it made no attempt to reconcile those provisions. Nor did the *Allegheny County* Court consider the argument presented here: that only *valid* ballots that will *count* can trigger the Timely Received Clause. Appellants also argue *Allegheny County* was wrongly decided because it failed to give due weight to the presumption in favor of constructions that expand the franchise.

Appellants distinguish the issue of counting their provisional ballots from *curing* their defective mail-in ballots. They claim the Trial Court erred in conflating those issues. *See, e.g.*, Trial Court Op. at 22-23 (citing *Boockvar*, 238 A.3d at 361, for the proposition that the Election Code does not require a curing process for defective mail-in ballots); *id.* at 27 ("[A]ny chance to correct a deficient ballot . . . , including by casting a provisional vote, constitutes a 'cure.'"). Although the Election Code is silent on ballot curing, leaving that choice up to each county, Appellants argue the Election Code requires that their provisional ballots be counted, regardless of any notification about or curing of defects in their mail-in ballots.

Finally, Appellants argue that adopting the Board's construction would cause the Election Code to violate the free and equal elections clause of the Pennsylvania Constitution. First, rejecting the provisional ballots, when the earlier mail-in ballots were also cancelled, amounts to a restriction on voting that must be tied to a compelling reason, which the Board has failed to articulate. Second, the Board's construction would be an unreasonable restriction on the franchise, and the Constitution requires that *any* restriction on voting—whether a ballot casting rule or a ballot counting rule—must be reasonable and nondiscriminatory. Appellants

17

invite us to avoid these constitutional problems by construing the Code as they propose.

*2. Appellees*

Appellees argue the Election Code—specifically the Timely Received Clause found in 25 P.S. § 3050(a.4)(5)(ii)(F)—prohibits the Board from counting Electors' provisional ballots. They claim that the Timely Received Clause is not in conflict with the Casting Clause in 25 P.S. § 3050(a.4)(5)(i) because the latter expressly says it applies "except as provided in subclause (ii)." Thus, they argue because the exception—the Timely Received Clause—is triggered, the general rule does not apply and there is nothing left for the Court to interpret. Appellees argue all that is necessary for a ballot to count as "timely received" for purposes of 25 P.S. § 3050(a.4)(5)(ii)(F) is for the elector to mail a declaration envelope to the Board and for the Board to receive the envelope timely. This is true, they argue, independent of what the declaration envelope contains, whether a ballot or anything else. Appellants argue this Court reached precisely that holding in *Allegheny County*.

Appellees claim that Appellants' proffered construction misunderstands the word "received" in the Timely Received Clause. In their view, receipt means actual receipt, and they argue that the voting equipment's designation of a mail-in ballot as "pending" or "cancelled" is legally irrelevant to whether the Timely Received Clause prohibits counting a provisional ballot. Similarly, they argue, receipt cannot depend on opening the declaration envelope to verify that the ballot was properly and validly cast, since that does not occur until votes are being canvassed. Similarly, Appellees argue that "casting" is distinct from "receiving"— the former is done by an elector, while the latter is done by the Board. Both of those

18

acts occur before the ballot is canvassed, so neither can depend on whether the vote is valid (which, in the case of non-facial defects, is not known with certainty until the ballot is canvassed).

In response to Appellants' insistence on the connection between mail-in voting and the need for provisional ballots, Appellees stress that provisional ballots have nothing to do with mail-in voting. Relatedly, they dismiss the SURE System notification provided to Electors, which invited them to cast provisional ballots because their mail-in ballots were invalid, as "legally unfounded," nonauthoritative guidance from the Secretary of the Commonwealth (Secretary). Republican Party's Br. at 29. In support, they cite *Boockvar* for the proposition that the Secretary cannot compel counties to allow cure of defective mail-in ballots, arguing that this, in turn, implies the Secretary cannot tell voters when they are permitted to cast provisional ballots.

Throughout their arguments, Appellees contend that the Board's counting the provisional ballots would have effectively been a "cure" of Electors' defective mail-in ballots via provisional voting. The Board specifically argues that Appellants' proffered construction is an attempt at declaratory or injunctive relief requiring counties to implement notice and cure policies via provisional voting. This, it argues, would violate the Election Code which, as construed in *Boockvar*, does not require counties to implement notice and cure procedures for mail-in or absentee ballots.

Finally, the Republican Party responds to Appellants' constitutional arguments emphasizing the equality of opportunity afforded to Electors, on the basis that they *could have cast* valid mail-in ballots just as every other voter could have done. It argues this settles the constitutional issue because the free and equal

19

elections clause limits only voter-qualification rules and rules amounting to a denial of the franchise, not ballot casting rules like those Electors failed to follow here.

## B. Arguments of *Amici Curiae*

The Department of State and the Secretary have filed a joint brief as *amici curiae*.[13] The Secretary begins by clarifying that, in his view, the Trial Court and Appellees have wrongly conflated ballot curing with provisional voting. This case, he argues, is not about ballot curing at all. The only question is whether Electors' provisional ballots must be counted under the Election Code, which provides separately for provisional voting. Unlike for ballot curing, which is discretionary, all county boards of elections must follow the Code's provisional voting sections.

The Secretary argues that the two Code clauses that control provisional ballot counting are ambiguous, but the ambiguity should be resolved to require the Board to count the provisional ballots. As a preface to that argument, the Secretary emphasizes that HAVA created provisional voting to ensure that "a ballot would be submitted on election day but counted if and only if the person was later determined to have been entitled to vote." *Sandusky Cnty. Dem. Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). The Secretary describes the process of voting provisionally and points out that the Timely Received Clause is just one among many bases on which a provisional ballot might not be counted, even if the voter is eligible to vote. Other reasons include failure to comply with rules for submitting the provisional ballot. *See* 25 P.S. § 3050(a.4)(5)(ii)(A)-(F).

Given that context, the Secretary argues that the Election Code, when considering all its provisional voting sections, is ambiguous regarding how

---

[13] We refer to these arguments as the Secretary's because the Secretary is the head of the Department of State.

20

provisional ballots should be treated. He first cites the instructions given to voters on mail-in and absentee ballots themselves: that they may cast a provisional ballot if their "**voted** ballot is not timely received." 25 P.S. § 3146.3(e)[14] (for absentee ballots); *accord id.* § 3150.13(e) (for mail-in ballots) (emphasis added). Critically, he explains, the General Assembly added the word *voted* to those instructions by amendment in 2020; they had previously only referred to a "ballot" or "mail ballot" without the concept of a "**voted** ballot." *See* Secretary's Br. at 12 (citing Section 9 and 12.1 of the Act of Mar. 27, 2020, P.L. 41, No. 12). And in Act 77 of 2019, the word *voted* was also added when authorizing mail-in voters to vote by provisional ballot. By statute, the district register lists only voters whose earlier ballot has been "received **and voted**" as having voted. 25 P.S. § 3150.16(b)(1) (for mail-in ballots); *see also id.* § 3146.6(b)(1) (same, for absentee ballots). Also by statute, if an absentee or mail-in voter's name is not listed on the district register as having "**voted** the [mail-in or absentee] ballot," then that voter "may vote by provisional ballot." *Id.* § 3146.6(b)(2); *accord id.* § 3150.16(b)(3). The Secretary explains that the Trial Court construed the Timely Received Clause in isolation, and its reading cannot be consistent with these other amendments to the Code. These provisions clearly require that one's right to vote by provisional ballot is not contingent on the Board's bare receipt of a ballot, but on having already **voted**. *See* Secretary's Br. at 25-26.

The Secretary insists that we must resolve these ambiguities to avoid unreasonable results by construing *in pari materia* the terms *timely received* and *voted* to refer only to an earlier ballot that will be counted because it was successfully voted and is valid. In other words, a ballot that is invalid, cancelled, or not properly cast cannot trigger the Timely Received Clause. The Secretary urges us to resolve

---

[14] Added by Section 11 of the Act of March 6, 1951, P.L. 3.

the ambiguity in favor of counting ballots and expanding the franchise, rather than disenfranchising Electors.

## IV. DISCUSSION

We begin with the principles of statutory construction set forth by our Supreme Court:

> When presented with matters of statutory construction, [we are] guided by Pennsylvania's Statutory Construction Act [of 1972], 1 Pa.C.S. § 1501-1991. Under this Act, "the object of all statutory construction is to ascertain and effectuate the General Assembly's intention." *Sternlicht v. Sternlicht*, [] 876 A.2d 904, 909 ([Pa.] 2005) (citing 1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly[.]")). When the words of a statute are clear and unambiguous, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). However, when the words of a statute are not explicit, the General Assembly's intent is to be ascertained by consulting a comprehensive list of specific factors set forth in 1 Pa.C.S. § 1921(c). *See also* [*Pa.*] *Associated Builders & Contractors, Inc. v.* [] *Dep't of Gen. Servs.,* [] 932 A.2d 1271, 1278 ([Pa.] 2007) (recognizing that when the "words of the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the circumstances of its enactment; the object it seeks to attain; the mischief to be remedied; former laws; consequences of a particular interpretation; contemporaneous legislative history; and legislative and administrative interpretations").
>
> . . . .
>
> [The Supreme] Court has previously observed that the purpose and objective of the Election Code . . . is "[t]o obtain freedom of choice, a fair election and an honest election return[.]" *Perles v. Hoffman*, [] 213 A.2d 781, 783

([Pa.] 1965). To that end, the Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice. *Id.* at 784.

*Boockvar*, 238 A.3d at 355-56 (some citations omitted).

Because Appellants and the Secretary urge us to find the Election Code ambiguous, the following principles are especially important. We find ambiguity when multiple interpretations of a statute are reasonable, including competing interpretations proffered by the parties. *Id.* at 360. Divergent judicial interpretations of a statute can also signal that multiple interpretations are reasonable, and thus that the statute is not clear. *See Bold v. Dep't of Transp., Bureau of Driver Licensing*, ___ A.3d ___, 2024 WL 3869082, (Pa., No. 36 MAP 2023, filed Aug. 20, 2024), slip op. at 11-12. Ambiguity can be textual, but it can also be contextual, arising from multiple parts of a statute considered and construed together when they must be. *See id.* at 390 (Wecht, J., concurring); *King v. Burwell*, 576 U.S. 473, 474-75 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). When searching for clear meaning, as at every other time, this Court "must always read the words of a statute in context, not in isolation." *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019).

## A. The Casting Clause and Timely Received Clause Are Ambiguous When Considered Together With the Having Voted Clause

The parties dispute whether the Casting Clause and Timely Received Clause are ambiguous. In *Allegheny County*, we considered the Timely Received Clause in isolation and opined that it is unambiguous. Slip op. at 8. But we did not

consider the Casting Clause because we were not asked to. And we did not consider the Having Voted Clause. We agree with the Secretary that these three clauses must be construed together in the Code's statutory scheme, and not in isolation. *Gavin*, 205 A.3d at 1221.

The Having Voted Clause specifically authorizes a mail-in voter to "*vote* by provisional ballot" so long as he "is not shown on the district register as having *voted*." 25 P.S. § 3150.16(b)(2) (emphasis added). The Timely Received Clause uses a different term: the Board must not count the ballot if "the elector's absentee ballot or mail-in ballot is timely *received*." *Id.* § 3050(a.4)(5)(ii)(F) (emphasis added). Finally, and only if the Timely Received Clause is not triggered,[15] the Casting Clause comes into play. It requires that, absent any other ground to not count the ballot under subsection (a.4)(5)(ii), the Board must count the provisional ballot "if . . . the individual did not *cast* any other ballot, including an absentee ballot, in the election." *Id.* § 3050(a.4)(5)(i). Among other important issues, we are required to consider the meaning of *vote*, *voted*, *timely received*, *cast*, and *ballot*.[16] The Election Code does not define these words for purposes of the provisions at issue here.[17] Nor does the Statutory Construction Act supply default definitions. *See* 1 Pa.C.S. § 1991.

---

[15] We agree with Appellees that the Casting Clause becomes controlling if, and only if, no part of subsection (a.4)(5)(ii)—including the Timely Received Clause—is triggered. This is obvious: the paragraph containing the Casting Clause applies by its terms "[e]xcept as provided in subclause (ii)." 25 P.S. § 3050(a.4)(5)(i).

[16] There is no congruence across the language of these clauses. They use different verbs (sometimes used adjectivally as past participles). *Vote* or having *voted* is not *received* is not *cast*. All three sections refer to the noun *ballot* but none defines it. This lack of congruence is apparent here where Electors' ballots were timely received, but they had not voted.

[17] *Ballot* is the only one of these words defined anywhere in the Election Code. It is defined in 25 P.S. § 3031.1 as follows:

**(Footnote continued on next page…)**

In order to faithfully effectuate the language of the legislature, we look to the way these terms are used in the Code for context. A voter can *cast* a ballot merely by filling it out without ever submitting it. *See* 25 P.S. § 3050(a.4)(3) ("After the provisional ballot has been *cast*, the individual shall place it in a secrecy envelope."). Other uses of *cast* obviously refer to delivery to a location, not filling out. *See id.* § 3050(a.4)(5)(i) (describing a voter "registered and entitled to vote at the election district where the ballot was *cast*"). Still other uses refer to a *vote*, rather than a ballot, being *cast*. *See id.* § 3050(a.4)(4)(vii) ("[T]he votes *cast* upon the challenged official provisional ballots shall be added to the other votes *cast* within the county."). Thus, even in parts of the Code not at issue here, the word *cast* is used in different senses.

Perhaps the most important tension is between *voting* and the other terms. The Secretary convincingly argues that the Code's provisional voting sections have been recently amended—in 2019 and 2020—to tether the statutory right to vote by provisional ballot to not just the receipt of a mail-in or absentee ballot, but also to whether that ballot was *voted*. *See* 25 P.S. §§ 3146.6(b)(1)-(2) (absentee ballots); 3150.16(b)(1)-(2) (mail-in ballots).[18] Both of those provisions use *voted* not just with respect to a ballot, but also more generally—a person is not

---

"Ballot" means ballot cards or paper ballots upon which a voter registers or records his vote or the apparatus by which the voter registers his vote electronically and shall include any ballot envelope, paper or other material on which a vote is recorded for persons whose names do not appear on the ballot labels.

But that definition is not controlling because, by its terms, it applies only "as used in [that] article [, i.e., Article XI-A of the Code, 25 P.S. §§ 3031.1-3031.22]," which we are not construing here.

[18] Although only mail-in ballots are at issue here, we, like the Secretary, believe that the parallel absentee ballot provisions are also useful in construing terms like *voted*, because they closely mirror the language of the mail-in ballot provisions and were amended at nearly the same time.

25

entitled to cast a provisional ballot at their polling place on Election Day if the district register shows they have already *voted*. That language is in tension with Appellees' proffered construction of the Timely Received Clause. They claim all that is relevant is receipt of a ballot by the Board, regardless whether that ballot has been *voted* or whether the elector has already *voted*. And they go further, claiming that *ballot* in the Timely Received Clause refers not to a ballot but to the **declaration envelope** which, once received, prevents counting a provisional ballot, even if the received envelope is found to be empty. As the Secretary points out, there is an alternative plausible meaning—considering the Code as a whole, the Timely Received Clause is triggered once a ballot is received timely, but only if that ballot is and remains *valid* and *will be counted*, such that that elector has already *voted*. If the ballot is cancelled or invalid, it should not be considered to trigger the Timely Received Clause, because the elector has not already voted. Thus, when viewing the terms *voted, received*, and *cast* in the Code's broader scheme, they are contextually ambiguous.

We can resort to dictionaries for plain meaning, but they give no clarity in this case. A *ballot* was historically "a small colored ball *placed in a container to register* a secret vote," and since refers "by extension [to] a ticket, paper, etc., *so used*."[19] This sense, which bakes in the concept of *use* or *placing in*, differs from the way *ballot* is defined for Article XI-A of the Code (which is, again, not controlling here) which refers to paper on which a voter "records" or "registers" his vote, without reference to use. The ambiguity is highlighted by what *is* clear in the Code's

---

[19] *Ballot*, OXFORD ENGLISH DICTIONARY (OED), https://www.oed.com/dictionary/ballot _n1?tab=meaning_and_use#28858985 (last visited Aug. 31, 2024); *accord Ballot*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("An instrument, such as a paper or ball, *used fo*r casting a vote." (emphasis added)).

26

language: regardless of what *ballot* means, it certainly does not mean an empty declaration envelope, as the Trial Court concluded and as Appellees argue. Though an envelope is not enough, it is not clear what is enough to be a mail-in or absentee *ballot*—must it be completed, or voted, or valid, or is a blank ballot sufficient? Dictionaries do not tell us.

The words *cast* and *voted* may be roughly synonymous. *Cast* means "[t]o deposit (a voting paper or ticket); to give (a vote)."[20] *Voted* as an adjective or participle means "[e]stablished or assigned by vote."[21] But the verb *vote* means "[t]o give or register a vote; *to exercise the right of suffrage*; to express a choice or preference by ballot or other approved means."[22] But which of these meanings applies in the Code is not clear. For a ballot to be *cast* may mean merely that it was "deposited," but it may also entail "giv[ing] a *vote*," which implies that the vote itself—not just the paper that records it—is validly cast. And for a ballot to be *voted* may entail not just completion or transmission, but that the elector has actually "exercise[d] the right of suffrage" through voting the ballot. Finally, *received* obviously means "to take into . . . possession (something offered or given by another)" or "to take delivery of (something) from another."[23] But though that word

---

[20] *Cast*, OED (transitive verb sense I.1.f), https://www.oed.com/dictionary/cast _v?tab=meaning_and_use&tl=true#10038401 (last visited Aug. 31, 2024); *see also Cast*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To formally deposit (a ballot) or signal one's choice (in a vote).").

[21] *Voted*, OED (adjective sense 2), https://www.oed.com/dictionary/voted_adj?tab=meaning _and_use#15491584, (last visited Aug. 31, 2024).

[22] *Vote*, OED (intransitive verb sense II.3.a) (emphasis added), https://www.oed.com/ dictionary/vote_v?tab=meaning_and_use#15490698 (last visited Aug. 31, 2024); *see also Vote*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining the noun *vote* as "the expression of one's preference . . . in . . . an election").

[23] *Receive*, OED (transitive verb sense III.9.a), https://www.oed.com/dictionary/ receive_v?tab=meaning_and_use#26542154 (last visited Aug. 31, 2024).

is clear, the meaning of the thing that is to be received—the *ballot*—is not, so the Timely Received Clause remains murky.

The Timely Received Clause, considered with its companion clauses, uses nonuniform and undefined terminology, the meaning of which is not plain in context. This—together with the competing interpretations offered by the parties and divergent decisions accompanied by opinion from at least three courts of common pleas[24]—leads us to conclude that "the words of the [Code] are not explicit." 1 Pa.C.S. § 1921(c).

## B. Resolving the Election Code's Ambiguity

Having determined the words of the Having Voted, Casting, and Timely Received Clauses are ambiguous, we are now tasked with resolving such ambiguity. In so doing, we are guided by the following principles.

Once ambiguity is found, we look beyond the words of the statute so that it can have a meaning, and thus have effect, as the General Assembly intended.[25] We faithfully resolve the ambiguity in favor of the legislature's object, using the interpretive tools set forth in Section 1921(c) of the Statutory Construction Act. 1 Pa.C.S. § 1921(c). Section 1921(c) permits the court to ascertain the intention of the General Assembly by considering, *inter alia*, the object to be attained, and the consequences of a particular interpretation. *Id.* § 1921(c)(4), (6). Notably, when

---

[24] *Compare* Trial Court Opinion, *with Ctr. for Coalfield Justice v. Wash. Cnty. Bd. of Elections* (Wash. Cnty. Ct. Com. Pl. No. 2024-3953, filed Aug. 23, 2024), slip op. at 25-27 (holding that the Timely Received Clause is ambiguous and construing it in favor of counting provisional ballots); *Keohane*, slip op. at 5 (ordering provisional ballots under these same circumstances to be counted).

[25] Notably, we engage in this analysis only and precisely because we have concluded that the Code is ambiguous. *Cf. In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1082 (Pa. 2020) (Wecht, J., concurring and dissenting) (observing that we have "only one juridical presumption *when faced with unambiguous language*: that the legislature meant what it said" (emphasis added)).

28

resolving ambiguity in election cases, we must also consider the imperative to protect the elective franchise. *See Boockvar*, 238 A.3d at 360-61. Thus, we resolve any ambiguity in favor of protecting the franchise and to avoid discarding an elector's vote. *Boockvar*, 238 A.3d at 361; *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972). In that enterprise, "[w]ords and phrases which may be necessary to the proper interpretation of a statute and which do not conflict with its obvious purpose and intent, nor in any way affect its scope and operation, may be added in the construction thereof." 1 Pa.C.S. § 1923; *id.* § 1928 (requiring statutes to be "liberally construed to effect their objects and to promote justice").

Applying these tools, we first look to the object to be attained by the Election Code, which includes Act 77's addition of the Having Voted Clause, and amendments to the Casting and Timely Received Clauses. As observed by our Supreme Court in *Boockvar*, "the purpose and objective of the Election Code, which contains Act 77, is 'to obtain freedom of choice, a fair election and an honest election return.'" *Boockvar*, 238 A.3d at 356 (quoting *Perles*, 213 A.2d at 783). This objective is advanced by ensuring that each qualified elector has the opportunity to vote **exactly once** in each primary or election. Not zero times, which would deprive an elector of the freedom of choice, and not twice, which would prevent an honest election return.

In 2019, the General Assembly amended the Code by passing Act 77, which established universal mail-in voting in the Commonwealth, the object of which is to make voting more convenient for qualified electors. In enacting 25 P.S. § 3150.16, the General Assembly included the Having Voted Clause. Despite its use of ambiguous terms as described above, the General Assembly clearly included the Having Voted Clause to give mail-in electors the opportunity to vote

29

provisionally so long as they are "not shown on the district register as having voted" by mail. Indeed, a mail-in elector can *only* vote provisionally if the district register so shows.[26] Appellees' proffered construction of the Clauses at issue fails to make voting more convenient for qualified mail-in electors, the object of Act 77, and in actuality, renders it impossible for them to have voted. In other words, by adopting Appellees' proffered construction, Electors wind up with exactly zero votes in the 2024 Primary. This falls short of the object the General Assembly sought to attain by enacting Act 77 and the Election Code as a whole. This construction disenfranchises Electors. Appellants' and the Secretary's proffered construction, however, comports with the objects of the Election Code, including Act 77, by permitting Electors to vote exactly once in the 2024 Primary Election. Their reading resolves the noted ambiguities reasonably in favor of protecting the franchise and avoids depriving Electors of their vote. *Boockvar*, 238 A.3d at 361.

When considering the consequences of the parties' competing interpretations, 1 Pa.C.S. § 1921(c)(6), it becomes even more clear that Appellants' reading achieves the General Assembly's intention while Appellees' reading does not. *See Boockvar*, 238 A.3d at 380 (citing 1 Pa.C.S. § 1922(1)) ("[W]e must in all instances assume the General Assembly does not intend a statute to be interpreted in a way that leads to an absurd or unreasonable result."). Here, Electors were notified that their vote "would not count" in advance of the 2024 Primary. They appeared at their respective polling places on the day of the 2024 Primary and were permitted to cast a provisional ballot. Under Appellees' construction, Electors' provisional voting was an exercise in futility, as Electors' provisional vote, under no

---

[26] While there is no testimony here regarding whether Electors were "shown on the district register as having voted," we presume the County followed the Code and only permitted Electors to vote provisionally because the district register did not reflect that they had "voted."

circumstances, would be counted. Appellees assert Electors are foreclosed from voting entirely because the Board timely received their declaration envelope. Under Appellees' construction, they had "already voted"—despite that their mail-in ballots will not be counted.

Other concerns about consequences were conceded by the Trial Court and borne out by Director McCurdy's testimony. *See supra* pp. 8-10.[27] Under Appellees' proffered construction, an elector could omit his mail-in ballot altogether but return the secrecy and declaration envelopes to the Board, and still be unable to vote provisionally. A commonsense reading of the Code, of course, would permit this mail-in elector to cast a provisional ballot because no "voted" ballot was timely received by the Board, and thus the voter cannot be marked as having "voted" on the district register. 25 P.S. §§ 3146.6(b)(1), 3150.16(b)(1). However, Appellees' position would result in the Board denying that elector's provisional ballot even though he never submitted a mail-in ballot. This would render the Having Voted Clause, which authorizes voting by provisional ballot, without any effect. What can be the effect of casting a provisional ballot that, as a matter of certain statutory operation, could never be counted?

That construction of the Code would not just create surplusage. It would also be unfair and misleading to the electorate because it would invite electors to cast dummy ballots that were nullities before they were ever cast. By Appellees' construction, the provisional ballot's status as not countable is locked in amber at the moment the Board receives a mail-in elector's declaration envelope, without regard to whether the enclosed ballot is later determined to be invalid, or not to be a ballot at all. Appellees' construction would reduce the statutory right to cast a

---

[27] Director McCurdy could not reconcile what constitutes a "ballot" in the above hypothetical. Hr'g Tr. at 63-64. This underscores the ambiguities in the Code.

provisional ballot as a failsafe for exercising the right to vote, just in case, to a meaningless exercise in paperwork. Such a provisional ballot would be "provisional" only euphemistically. In Appellees' view, it really never had a chance.[28]

Thankfully, we need not construe the Election Code to yield that result. Because its language is ambiguous on this point, we can and must construe the Code to give effect to the legislature's intent. The General Assembly obviously *did* intend that mail-in and absentee voters can vote by provisional ballot if they have not already voted an earlier ballot, as 25 P.S. §§ 3146.6(b)(2) and 3150.16(b)(2) provide. This entails the proposition that the provisional ballots so authorized could be counted under some circumstances. The General Assembly *did not* intend for those authorized provisional ballots to be rendered meaningless, essentially void *ab initio*, whenever the elector has made an earlier but unsuccessful *attempt* to cast or vote a ballot. 1 Pa.C.S. § 1922(2) (the Court presumes the General Assembly intended the statute to be effective and certain).

We reject Appellees' argument that reaching this result would effectively write a mandatory ballot-curing procedure into the Code—a proposition our Supreme Court considered and rejected in *Boockvar* when it held that "[b]oards

---

[28] Appellees position also rewards less-diligent mail-in electors while simultaneously punishing more-diligent ones. Electors in this case mailed their declaration envelopes to the Board well in advance of the 2024 Primary. Accepting Appellees' construction would require us to hold that Electors forfeited their right to vote in the 2024 Primary as of the Board's receipt of their declaration envelopes—no vote could ever be counted. Now consider a mail-in elector who mails his declaration envelope to the Board on the eve of the 2024 Primary Election. Realizing that the mail system may not deliver his ballot to the Board in time, that mail-in voter also appears at his polling place on the day of the 2024 Primary and casts a provisional ballot. If the mail-in elector's ballot was indeed tardy, the Board would count his provisional ballot. The lackadaisical mail-in elector winds up with one vote; the diligent elector winds up with none.

are not required to implement a 'notice and opportunity to cure' procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly." 238 A.3d at 374. The County has a ballot curing policy, but the Code independently authorizes electors to vote by provisional ballot, and, when properly construed, it requires the County to count the provisional ballots here. That does not depend on any ballot curing process, whether optional or mandatory. The provisional ballot is a separate ballot, not a cured initial ballot. The *Boockvar* Court only tangentially discussed provisional voting—the phrase appears only in a single sentence of that opinion. *See Boockvar*, 238 A.3d at 375 n.28 & accompanying text. To conclude, as the Trial Court did, that "any chance to . . . cast[] a provisional vote[] constitutes a 'cure'" is to both overread *Boockvar* and to read the provisional voting sections out of the Code. Trial Court Op. at 27. This was legal error.

Finally, we agree with Appellants and the Secretary that *Allegheny County* does not compel a different result. That unreported panel decision was reached in a different matter and is thus not binding. More importantly, the Court there was not presented with developed arguments on the issue now before us. The Court did not cite or discuss the Casting Clause in 25 P.S. § 3050(a.4)(5)(i) or attempt to reconcile it with the Timely Received Clause in 25 P.S. § 3050(a.4)(5)(ii)(F) that the Court found unambiguous. Perhaps because the parties in that case did not argue that the Code's provisions are ambiguous when taken together, the Court did not analyze that question, and we reach a conclusion here with the benefit of those arguments.[29]

---

[29] Given our construction of the Code, we do not consider Appellants' constitutional arguments.

## V. CONCLUSION

For the foregoing reasons, we conclude that (1) Electors did not cast any other ballot within the meaning of 25 P.S. § 3050(a.4)(5)(i), and (2) 25 P.S. § 3050(a.4)(5)(ii)(F) does not prohibit the Board from counting Electors' provisional ballots. Accordingly, because the record does not indicate any other basis under subsection (a.4)(5)(ii) on which the Board could have declined to count the provisional ballots, we reverse the Trial Court's decision and order the Board to count Electors' provisional ballots.

_____

MATTHEW S. WOLF, Judge

Judge Dumas dissents.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Faith Genser and Frank Matis, | : | **CASES CONSOLIDATED** |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Butler County Board of Elections, | : | |
| Republican National Committee, | : | Trial Ct. No. MSD-2024-40116 |
| Republican Party of Pennsylvania, and | : | |
| The Pennsylvania Democratic Party | : | No.    1074 C.D. 2024 |
| | : | |
| Faith Genser and Frank Matis, | : | |
| | : | |
| v. | : | |
| | : | |
| Butler County Board of Elections, | : | |
| Republican National Committee, | : | |
| Republican Party of Pennsylvania, and | : | |
| The Pennsylvania Democratic Party | : | |
| | : | |
| Appeal of: The Pennsylvania | : | |
| Democratic Party | : | No.    1085 C.D. 2024 |

# **O R D E R**

AND NOW, this 5th day of September, 2024, the order of the Court of Common Pleas of Butler County is REVERSED.  The Butler County Board of Elections is ORDERED to count the provisional ballots cast by Appellants Faith Genser and Frank Matis in the April 23, 2024 Primary Election.

_____
MATTHEW S. WOLF, Judge